Baldwin, J.
The slaves in. controversy in this case were sold by Wyche to the appellant Davis for their full value, actually paid in cash at the date of the contract; and on the same day, after the agreement was completely made, but before the payment of the price, or the execution of the bills of sale, Davis, at the solicitation of Wyche, and for the mutual accommodation of the parties, hired the slaves to him for a few months, at certain specified rates yielding an adequate compensation for their services. The transaction was perfectly fair and bona fide, without any purpose of defeating the rights of creditors, none of whom were in point of fact in any wise thereby deceived or defrauded. And we are called upon to decide whether this sale is to he condemned as fraudulent and void, and the property subjected to the demand of the appellee Turner, who as creditor of Wyche, levied an attachment thereupon while in possession of the latter, before the expiration of the period for which he had hired the same from Dams. This requires a consideration of what is sometimes called the doctrine of fraud per se.
*426 It seems free from doubt, and to be conceded in all discussions of the subject, that in sales of personal goods actual delivery is not necessary to the transmission of the title; and that by the contract of sale and present payment of the price, or an agreement to pay it thereafter, the purchaser acquires the right of property and may recover it by action. Thus, if A sells to B a horse in presentí, and receives payment therefor, or B’s note or promise to pay at a future day, the title passes from A and becomes vested in B, and is not affected by the failure of A to deliver, or of B to demand, the immediate possession. Now, as the dominion over a man’s property belongs to him and not to his creditors, they can subject to their demands only the right which remains in him, and not that from which he has lawfully parted. The advocates, therefore, of the doctrine in question properly rest it, not upon the incompleteness, but the falseness of the purchaser’s title: they do not deny that it would be perfect, if it were fair; but they say that the law condemns it as fraudulent. Hence it is material to enquire in what the fraud consists.
A creditor has no right to insist that his debtor’s resources shall remain in any given shape. The latter may exchange his goods for any other property; he may sell them and put the money in his pocket, or apply it in his discretion to his debts, his purchases or his maintenance. The creditor having no specific lien must resort to the personal remedies given by law for coercion of payment. -But the debtor cannot divest himself of his apparent, and at the same time retain his substantial ownership, so as to elude the lawful pursuit of his creditors. His doing so in any form or shape is a trick, contrivance or fraud, which the law condemns, and frustrates.
The fraud is therefore to be found in the falsehood of the transaction; in the pretence of a sale when there is none; in the reservation of an interest for the grantor *427 under the cover of a transmission of his right to the grantee. The genuineness of the consideration is of course essential to the validity of the sale. Tf that be fabricated, the conclusion of fraud is irresistible, whether the grantor retains or the grantee has acquired the possession of the property. In the former case, the continued substantial ownership of the grantor is manifest: in the latter, the falsehood can be accounted for only by a design to delay, hinder or defeat his creditors. In neither case, can the collusive purchaser acquire any title by the contract.
On the other hand, if there be nothing feigned in the consideration ; if the property has been really sold for a fair and adequate price, actually paid or secured, it is difficult to conceive upon what ground the transaction can be properly treated as fraudulent, though the possession has not been delivered to the purchaser, in the absence of all other evidence of a fraudulent purpose. At least, it would seem reasonable that the grantee should be at liberty to prove that he has acted with perfect good faith, without any design to deceive or injure the grantor’s creditors, and especially that in fact the creditor complaining has been in no wise deceived or defrauded.
Thus, it seems to me, the essential enquiry, in most cases, is whether the consideration be fair and adequate or false and feigned; a question upon which there may be no positive evidence that can be safely relied on, and which must then of necessity be determined by the circumstances attending the transaction, such as the condition and resources of the parties, their connection and dealings with each other, and their course of conduct in relation to the subject. And upon such an enquiry, it is difficult to predicate of any single circumstance that it ought to be conclusive.
It is true that in the most natural and usual course of things, a fair purchaser desires and obtains the posses *428 sion of the property • and hence its being retained by the grantor gives rise to a suspicion of fraud, such as in view of the frequent arts and contrivances against the rights of creditors, warrants a presumption against the fa¡rness of the transaction, requiring full and satisfactory explanation ; a presumption which cannot be too strongly stated, to the effect of throwing the whole burthen of proving the genuineness and sufficiency of the consideration upon the grantee, and in the naked case of an alleged absolute sale, and possession notwithstanding retained, requiring the conclusion of fraud. But I cannot perceive any sound principle upon which the mere nondelivery of possession can be treated as conclusive against the fairness and good faith of the contract.
When it is said that the grantor’s retaining possession in the case of an absolute sale, renders the contract per se fraudulent, or fraudulent in law, I presume nothing more is usually meant than that it raises a presumption of fraud, so strong as to overrule all evidence whatever to the contrary. Accordingly, most advocates of the doctrine rest it upon the ground, that the inconsistency of the possession with the terms and effect of the deed, is evidence of fraud, which evidence they hold to be conclusive. Here then we perceive the principle already adverted to, that the fraud is to be found in the falsehood of the transaction, and when that falsehood is detected in the alleged consideration, I admit it to be conclusive. I admit, moreover, that the inconsistency of the possession with the terms and effect of the deed, is a circumstance to prove the consideration to be false and feigned; and, in the absence of proof to the contrary, should be considered sufficient for that purpose. But it cannot be denied that it is a circumstance which does not lead necessarily to that result, and sometimes happens not to be irreconcilable with a fair and honest contract, free from all imagination of fraud. If, therefore, the object be to ascertain the merits of the case, it *429 seems to me that to hold the inference conclusive, and in effect an estoppel to all further investigation, is against the plainest principles of presumptive evidence.
We are not however left to general reasoning on the subject. The question arises in the construction of a positive statute, the meaning of which is too plain to be misunderstood. Our statute to prevent frauds against creditors, (1 Rev. Code, p. 372,) taken substantially from the statute of 13 Eliz. ch. 5, is directed not against an inconsistent possession, but a fraudulent design; not against fair and honest contracts, but gifts, grants, conveyances, bonds, suits, judgments, &c. made and contrived of malice, fraud, covin, collusion or guile, to the intent or purpose to delay, hinder or defraud creditors; and contains an express proviso that it shall not extend to any estate or interest, &c. which shall be upon good consideration, and bona fide lawfully conveyed or assured to any person or persons, bodies politic or corporate. The common sense meaning of such language is obvious, and ought not to be perverted by an artificial interpretation.
We are sometimes told that the statute is declaratory of the common law, the principles of which would have led to the same results. This is doubtless true, at least to a great extent; but I do not perceive how it affects the construction of the statute. There are no principles of the common law which condemn an act lawful in itself, unless done with a vicious intent; nor even then do they make it a ground of redress, unless such intent has in fact been accomplished.
Twyne’s Case, 3 Coke 80, is an early and leading one upon the exposition of the statute, 13 Eliz., and its principles have been since uniformly recognized, though it seems to me, not always correctly understood. The case differs in material circumstances from the one before us, but it throws much light upon the potency attributable to iucousistoncy of possession with the terms and legal effect of the deed.
*430 That case was an information in the Star Chamber against Twyne for making and publishing a fraudulent gift of goods. The facts as stated in the report, were as follows: Pierce was indebted to Twyne in £ 400, an(j was ais0 indebted to C in £ 200. C brought an action of debt against Pierce, and pending the writ Pierce being possessed of goods and chattels of the value of £ 300, in secret made a general deed of gift of all his goods and chattels, real and personal whatever, to Twyne, in satisfaction of his debt; notwithstanding that Pierce continued in possession of the goods, and some of them he sold, and he sheared the sheep and marked them with his own mark ; and afterwards C had judgment against Pierce, and had a fieri facias to the sheriff, who by force of the writ came to make execution of the goods; but divers persons by the command of Twyne did with force resist the sheriff; and openly declared by the commandment of Twyne that it was a good gift, and made on a good and lawful consideration. And whether this gift, on the whole matter, was fraudulent and of no effect by the act of 13 Eliz. or not, was the question. And it was held that the gift was fraudulent within the statute, and the defendant was convicted.
It will be seen that the gift to Twyne was on a true and good consideration, but which was used for a false purpose. It was not in truth the moving consideration, or was so in part only. A man has a right to prefer one of his creditors to the rest, but not for the purpose of securing a benefit to himself against their lawful process. The Court inferred from the circumstances, (the whole question of law and fact being before it,) that there was a secret trust for the benefit of Pierce, the nature of which was illustrated by a case thus put: If a man be indebted to five several persons in the several sums of £ 20, and have goods of the value of £ 20, and make a gift of all his goods to one of them in satisfaction of his debt, but there is a trust between them, that the donee *431 shall deal favourably with him in regard of his poor estate, either to permit the donor or some other for him, or for his benefit, to use or have possession of them, and is contented that he shall pay him his debt when he is able, this shall not be called bona fide within the proviso of the statute. Thus in Twyne’s Case the preferred creditor ultimately secured his debt, which he might otherwise have lost • for which advantage gained, he yielded to the debtor a present benefit, at the expense of the other creditors. The fraudulent intent was inferred from various marks or badges, the chief of which were the gift being general, without exception of the donor’s wearing apparel or any thing of necessity; the donor’s continuing in possession, using the goods as his own, and trading and trafficking therewith; the gift having been made in secret, and pending the writ. The case was decided upon the ground of a fraudulent intent in point of fact deduced from the whole evidence, and not a word is said to indicate that the mere circumstance that possession did not accompany and follow the deed, rendered the gift fraudulent in law.
The case before us is not one of a preference given by a debtor to one of his creditors over the rest, but of a sale made to a stranger of certain specific property, for full prices paid in cash at the time of the contract, and all idea of any trust whatever in favour of the vendor is completely negatived by an unquestionably fair agreement for his paying to the vendee ample hires.
There may be cases, it is true, in which a purchase for a full valuable consideration, paid in money at the time of the contract, would be fraudulent against the creditors of the vendor; and doubtless it would be so if such an intent appeared from the evidence. But it is not, in the ordinary course of things, for a man to lay out his money for such a purpose, and it is difficult to suppose any but a malignant motive for his so doing. In a conflict of evidence, indeed, upon the question of *432 fact, whether such a consideration was in truth paid, the vendor’s retaining possession would be entitled to much weight; but so soon as the fact is conceded, it would seem rather immaterial whether the vendor retained or delivered the possession, inasmuch as the purchaser could in such a case have but little, if any, inducement to yield a trust in favour of the vendor, unless prompted by feelings of friendship or benevolence.
The first authoritative decision, I think, to sustain the proposition that in an absolute sale of personal goods, unless possession accompanies and follows the deed, the sale is to be treated conclusively as fraudulent and void, is to be found in Edwards v. Harben, 2 T. R. 587. That, too, it is to be observed, was the case of a preferred creditor, and though Butter, J. in his opinion uses strong language, it is not free from doubt whether he intended it to be understood beyond the mere naked case of an inconsistent possession.
It is certain that the doctrine of Edwards v. Harben, as commonly understood, has not been established in the English Courts. Dallas, Ch. J. in Steward v. Lombe, 5 Eng. C. L. R. 167, says, that the case of Edwards V. Harben has been dissented from often, and that in Kidd v. Rawlinson, 2 Bos. & Pul. 59, Ld. Eldon, Ch. J. cites and sanctions the following passage from Buller’s Nisi Prius 258: “ The donor continuing in possession is not in all cases a mark of fraud, as where a donee lends his donor money to buy goods, and at the same time takes a bill of sale for securing the money.” And see the remarks and citations of the learned reporter in a note to the case of Bissell v. Hopkins, 3 Cowen 189. A most able and judicious writer in commenting upon Twyne's Case says, (Smith’s Leading Ca. 43 Law Lib. p. 37:) “In the principal case, Pierce the grantor, was indebted to the grantee Twyne, which debt would have been a sufficient consideration to support a bona fide transfer of the goods, and the *433 ground upon which the Court proceeded was, not that there was no sufficient consideration to sustain a grant by Pierce to Twyne, but that the secrecy, the nondelivery, the clausula inconsueta, See. raised a presumption that the whole transaction was collusive and a juggle, and though purporting to be a sale, was in reality the creation of a trust for the benefit of Pierce.”
In another passage, page 36, the same writer says: “ Though in Edwards v. Ilarben, it was laid down in the express terms above stated, that an absolute sale without delivery of possession, was in point of law fraudulent, the tendency of the Courts has lately been to qualify that doctrine, and leave the whole circumstances of each case to a jury, bidding them decide whether the presumption of fraud deducible from the absence of a transmutation of possession shall prevail. And, indeed, it ought to be observed, that even in Edwards v. Harben, the words of Butter, J. were: ‘ If there be nothing but an absolute conveyance, without the possession, that in point of law is fraudulentby which his lordship may have intended, that where there was nothing, i. e. no facts whatever appearing, except the absolute conveyance and the nondelivery, that then the inference of fraud would be so strong that a jury ought not to resist it. But it is very different in cases where, although the conveyance is absolute, and the possession has not passed, still there are surrounding circumstances which shew that a fraud may not have been intended: in such cases, it cannot properly be said, that there is ‘ nothing but an absolute conveyance without the possession”
And again in the same annotation, p. 37, the writer says, “ It may therefore be safely laid down that, under almost any circumstances, the question, fraud or no fraud, is one for the consideration of the jury. See the judgments in Martindale v. Booth, 23 Eng. C. L. R. 130, where several cases establishing this point are cited; and see Carr v. Burdiss, 5 Tyrwh. R. 316, the *434 expressions of Parke, B.; Dewey v. Bayntun, 6 East 257; Reed v. Blades, 5 Taunt. 212.”
And in a note to a later edition of the same work it is said. “ The modern doctrine is, that it must be left t0 t[ie jury t0 say¡ whether the continuance in possession is fraudulent or not. It is a strong fact, but not conclusive.” Per Tindal, Ch. Justice, in Lindon v. Sharp, 6 M. & Gr. 895, 898.
The Supreme Court of the United States, in the case of Hamilton v. Russel, 1 Cranch 309, 316, adopted and followed, in its broadest sense, the doctrine asserted in Edwards v. Harben; and hence it has found its way extensively amongst opinions and decisions of the State Courts. There the discussions and applications of it have been numerous, perplexed and conflicting, abounding in nice disquisitions and subtle distinctions. In some of the States the doctrine has been rejected altogether, and the statutory enactment adhered to according to its plain and common sense interpretation. In others, it has been recognized with various exceptions and qualifications. Some have adopted it without modification, and even extended it beyond both its letter and its spirit: while in others the war between the rival systems has been waged with precarious and doubtful success: and in one or more, the whole subject has become involved in inextricable confusion. The cases are referred to and briefly noticed in a note to the American edition of Smith’s Leading Cases, 43 L. Lib. p. 40 to 59. A collection of them in extenso would fill huge volumes: an examination of them in detail as authority would present a disheartening and endless circle.
With great deference, it seems to me; that the introduction and pursuit of this doctrine of fraud per se has been prompted by a commendable wish to accomplish a desirable but impracticable object. If a short and easy mode could.be found of cutting up fraud by the roots, *435 the discovery would be invaluable; but such an enterprise is beyond the limits of human wisdom. As the test of a fraudulent purpose, the rule in question has no claim to certainty: on the contrary, it concedes its own fallibility by crushing mercilessly the most convincing evidence of fairness and good faith. As a rule of policy, I think it can be shewn to be more than questionable.
In estimating this peremptory rule as a matter of policy, we must first look to the extent of it. The doctrine of Edwards v. Harben applies only to absolute sales: Butter, J. in his opinion says expressly, “ If the deed or conveyance be conditional, the vendor’s continuing in possession does not avoid it, because by the terms of the conveyance the vendee is not to have the possession till he has performed the condition.” The principle of this exception has frequently, though not uniformly, been extended to mortgages and deeds of trust; in both of which the grantor’s possession usually continues, by express or tacit agreement. And it appears to be the current of decision that the rule is not applicable to marriage settlements or agreements, for. the wife’s benefit, though the husband has the actual possession ; nor to purchases of the husband’s property made by the wife out of her separate estate. So, too, it has been often held that public sales by sheriffs, trustees and others, are not within the rule, though possession be still retained by the debtor. And no one, I presume, has ever supposed it applicable to original loans between parent and child, or any other persons.
Now, the policy of the rule is, in one aspect, to prevent a fraudulent possession from being covered by conveying away the title; and, in another, to prevent an honest possession from gaining a deceptive credit. In either point of view, the rule is too narrow, and goes to the form rather than the substance of the transaction. In simulated contracts, it is easy to mould the conveyance so as to avoid the discrepancy. Nothing more is *436 necessary than to give to the transaction the form of a conditional sale, or a mortgage, or deed of trust, or a marriage settlement, or a purchase at a bailiff’s, sheriff’s, judicial or trust sale. The very notoriety which in cases 0f p^blici sales may be properly relied on as evidence to repel the imputation of fraud, is sometimes resorted to as a mere disguise: for example, we can readily suppose a case, that doubtless has not unfrequently occurred, of goods purchased in at an officer’s sale in the name of a confederate, with funds furtively furnished by or on the part of the embarrassed debtor.
So, where the continued possession is honest, the fallacious credit it may give is in no wise attributable to the form of the contract, and the injury results merely from the failure of the supposed ownership. If a man encumbers his property by mortgage or deed of trust, he is no longer to that extent the substantial owner; and if he continues in possession, the probability of his thereby gaining a false credit is quite as great as if he had conveyed by an absolute deed. A preventive of the evil may be found in requiring the parties to give notoriety to the transaction; but that is a matter beyond the province of judicial regulation, and requires the aid of legislative enactment. Accordingly in Virginia the exigency has been provided for by our statute regulating conveyances, 1 Rev. Code, ch. 99, § 4, p. 362; which requires all deeds of trust and mortgages to be registered, as the condition of their validity against creditors.
There are no cases in which the evil of a factitious credit, arising out of the possession of personal property without title, may be more extensive than in those of marriage settlements; the result of which may be, (in the absence of statutory regulation,) to permit the husband to have the possession and ostensible ownership for many years, without prejudice to the rights conferred upon or reserved to the wife by the contract. A provision for the protection of creditors in such cases is em *437 braced in the Virginia statute above cited, requiring the deed to be registered.
It must also bo obvious to every one that protracted loans of slaves or other chattels have a strong tendency to mislead the public in regard to the ownership; such as to require, not a violent, but discreet legislation on the subject; which has been introduced into our statute book, by a clause in our act against fraudulent alienations, 1 Rev. Code, ch. 101, p. 373, providing that “ where any loan of goods and chattels shall be pretended to have been made to any person with whom, or those claiming under him, possession shall have remained by the space of five years, without demand made and pursued by due process of law on the part of the pretended lender, or where any reservation or limitation shall be pretended to have been made of a use or property, by way of condition, reversion, remainder, or otherwise, in goods and chattels, the possession whereof shall have remained in another as aforesaid, the same shall be taken, as to creditors and purchasers of the persons aforesaid so remaining in possession, to be fraudulent within this act, and that the absolute property is with the possession, unless such loan, reservation, or limitation of use or property, were declared by will or by deed in writing, proved and recorded,” as directed by the act.
It may be a question of policy worthy of consideration whether our registry laws might not be judiciously extended to absolute bills of sale, so as to require them, as well as deeds of trust and mortgages, to be recorded where possession is not delivered to the grantee. The experiment has been tried in Maryland, but with what success I am uninformed. In that state they have a statute placing deeds of sale and mortgages of personal chattels upon the same footing as to registration, and rendering them void if not recorded, except between the parties, unless there be actual notice or a transmission of the possession.
*438 Thus, I think, it will be seen that the supposed evils, so far as they exist, which the rule in question proposes to guard against, spring not from inconsistency of possession with the deed, but the separation of the title from the possession, whatever may be the form or nature of the contract by which such separation has been occasioned. Indeed it has sometimes been lamented that the law has permitted the possession and apparent ownership of personal property to be in one person, and the title in another, instead of prescribing that the possession of such property shall carry the title. No one, however, has ventured to propose directly so extensive an innovation ; though a vague idea of some such policy would seem to have suggested the doctrine of Edwards v. Harben.
In the application of the rule of Edwards v. Harben, a rigid adherence to its terms was soon found to be impracticable. Circumstances often occurred to prevent an immediate delivery of possession ; such as the distance of the property, the difficulty of removing it, the possession of it by another, the disabilities of parties, and various accidental causes. We find, therefore, numerous opinions and decisions recognizing the validity of absolute sales, in which possession did not accompany, and some in which it did not even follow, the deed. The dispensations are sometimes absolute, but more frequently with conditions or qualifications assuming a variety of phases. The non-transmission of possession has been excused because of the ponderous, or unwieldy, or irremovable nature of the property; as a windmill on leased premises, bricks in a brickyard, a growing crop, &c. So of unfinished hides in a tanyard and the bark and tools requisite for tanning them; or an article of furniture in the course of construction. So in the case of a slave or other chattel bailed or hired to a third person. So where a delivery of possession is prevented by sickness, death or other accident. So in the case of a *439 ship or goods at sea. In most of such cases when the . . . n . , . . r ,. transmission ot possession is postponed, a degree oí chligence is substituted for actual delivery; it being usually laid down that the delivery must be as soon, or as far as practicable, or in a convenient or reasonable time, and notice given to third persons having the temporary possession.
These and the like cases of absolute, or temporary, or qualified dispensation, are sometimes justified on the ground of conformity with the rule itself, inasmuch as it is said that according to its fair and reasonable construction, the possession cannot be regarded as inconsistent with the deed. This would doubtless in most instances be a just view of the matter, if the question were whether there had been a performance of an unobjectionable contract. But the question is of a quite different nature. It is whether the contract itself be not fraudulent and void. The rule declares it to be so conclusively, unless possession accompanies and follows the deed. Now in the cases mentioned, the grantor actually or virtually retains the possession; and the impracticability, or difficulty, or inconvenience of delivering it is not an adherence to the rule, but an excuse or apology for not adhering to it. It is therefore no answer to a conclusive presumption, though it might be, with other circumstances, to one that is only prima facie.
These modifications may mitigate, but cannot justify the positive rule in question ; and they are attended with the practical inconvenience of multiplying collateral issues both of law and of fact, without throwing any light upon the truth and justice of the cause. They involve questions of practicability, of disability, of diligence, of notice, &c., upon which the case may be made to turn, wholly irrespective of the fairness and good faith of the transaction. And it is somewhat remarkable that a person should be convicted of a fraud, upon a nice question whether he has used reasonable diligence, or given due notice.
*440 The application of the rule of Edwards v. Harben, involved also a consideration of the terms and legal effeet of the deed, in order to ascertain whether the conveyance was to be treated as absolute or conditional. These, by some decisions, have been taken in a strictly legal and technical sense, without regard to the intent of the parties, or the substantial object and purpose of the instrument. Thus, it has sometimes been held that the rule embraces mortgages, inasmuch as the legal title is conveyed to the mortgagee, who is entitled to the possession, and may recover it by an action at law. But the current of adjudication is the other way, the mortgage being regarded as a mere security for the debt, and the mortgagor as still the owner of the property, the legal title passing from him defeasibly only, and the equitable title not passing at all. The like principle, most generally, prevails in regard to incumbrances by deeds of trust. And we know that in point of fact the grantor in such securities usually retains the possession until ■ foreclosure or sale.
It is further to be observed that the operation of the rule in question, when applicable, has been to render a single circumstance in the conduct of the parties, posterior too to the making of the contract, conclusive upon the question whether the contract was fair or fraudulent. This I take to be a violation of the well known principle that when a conveyance is not fraudulent at the time, it cannot be made so by matter ex post facto. Shep. Touch. 67, Lady Lambert's Case. On the other hand, by what seems to me a strange incongruity, after the rule has condemned the contract as fraudulent, it becomes, according to repeated adjudications, relieved from the imputation by a transmission of the possession to the grantee, at any time before a creditor has obtained a specific lien by process of execution. The policy of the rule may thus be entirely defeated by a contrivance of the parties. After a supposed credit has been *441 gained by the grantor’s continued possession, and some one has been induced to trust him upon the belief of his ownership, and the person so becoming a creditor has sued for his debt and obtained judgment, but before he has resorted to process of execution the property is shifted into the hands of the grantee, who holds it in defiance of the artificial presumption. And so the web of legal casuistry, so artfully woven, proves abortive ; the fowler comes with his net, and lo ! the bird is flown!
The truth is, there is something rather loose and indefinite in the idea of a delusive credit gained by the possession of personal property. Some inconvenience may spring from this source, to be guarded against by prudent enquiries on the part of those concerned, and to some extent by legislative enactments, tending to a degree of notoriety in regard to the title. More than this seems to me a remedy worse than the disease; and it is obvious that to prohibit altogether the separation of the title from the possession of personal property, would be incompatible with an advanced state of society and commerce, and productive of much inconvenience and injustice iti the pursuits and business of life.
What has been said will perhaps serve to shew that the doctrine of fraud per se, as derived from the case of Edwards v. Harben, is not only objectionable in principle, and inadequate to the ends professedly in view, but in its administration, besides sometimes working gross injustice, is attended with various difficulties and incongruities. And thus it stood when the case of Sturtevant v. Ballard, 9 John. R. 337, was decided by the Supreme Court of New York.
In Sturtevant v. Ballard, the opinion of the Court, delivered by Kent, Ch. J. was probably suggested by the difficulty of maintaining that doctrine of fraud per se, of which Edwards v. Harben is the text, and numerous American cases the commentary. It strikes out, *442 as I conceive, a new doctrine of fraud per se. It seeks no aid from the principles of Twyne’s Case, which it does not even mention. It overrules, in effect, the distinction taken in Edwards v. Harben, between absolute and conditional sales; and regards mortgages as standing upon the same footing as absolute conveyances. The theory of the former advocates of fraud per se was, that the inconsistency of the possession with the deed raised a presumption of fraud which was intraversable: but such is not the theory of Sturtevant v. Ballard. The opinion of the Court in that case rests, not upon the inconsistency of the grantor’s continued possession with the terms and legal effect of the deed, but upon its inconsistency in the eye of the law, with honesty and fair dealing as regards creditors, whatever may be the nature of the conveyance, whether absolute or conditional, defeasible or indefeasible. It treats fraud, not as a matter of evidence, but as a mere matter of law.
This new doctrine of fraud per se approaches more nearly, and less circuitously than the former, the idea of making the possession of personal property carry the title. It is placed by the eminent Judge who introduced it, upon the ground that the continued possession of the grantor affects the validity of the title, and renders it by operation of law fraudulent and void as regards creditors, “ except in special cases and for special reasons, to be shewn to and approved of by the Court.” But he gives us no principle by which the exceptions are to be governed; and what principle can there be under his theory, unless that the particular circumstances shew the transaction to be fair and honest ? Indeed, he says himself, that “ delivery of possession is so much of the essence of the sale of chattels, that an agreement to permit the vendor to keep possession is an extraordinary exception to the usual course of dealing, and requires a satisfactory explanation.” Now, what explanation is so *443 satisfactory, and what can be given, other than that the possession was retained for a fair and honest purpose ? And it is remarkable that in most, if not all, the special cases stated by the learned Judge, that very explanation was given.
Tims, for example, he says: “in Bucknal v. Roiston, Prec. in Ch. 285, the goods were sold to A the lender of the money on bottomry; and he trusted B the borrower, to negotiate and sell the goods for A’s advantage. The Lord Chancellor held the sale good even against a judgment creditor, as the trust appeared upon the face of the bill of sale, and it was not to give a false credit, but for a particular purpose agreed upon at the time of sale.” So, “in Cole v. Davies, 1 Ld. Ray. 724, it was ruled by Holt, Ch. J. that if goods of A are seized upon a fi. fa. and sold to B bona fide, and for a valuable consideration, though B permits A to have the goods in his possession, upon the condition that A shall pay to B the money as he shall raise it by the sale of the goods, this will not make the execution fraudulent; and a subsequent act of bankruptcy by A would not defeat the sale.” So, “in Meggott v. Mills, 1 Ld. Ray. 286, it ivas held by the King’s Bench, that if a man lends another money to buy furniture, and takes a bill of sale of the furniture, leaving it in the vendor’s possession, and the contract be honest, it is then valid.”
If I have suggested the true principle of what are called special cases in Sturtevant v. Ballard, to wit, that the possession has been retained for a fair and honest purpose, it is obvious that they must multiply, as the exigency of circumstances may require, until ultimately they destroy the rule itself, or, what is the same thing, reduce it to one that is only prima facie. Indeed, it seems impracticable to preserve unbroken any rule of inflexible rigour on this subject, however inexorable in its terms; for the mind is apt to revolt against the despotism of a judicial dogma that oppresses the *444 truth and justice of a cause, or to seek refuge in subtle distinctions, artificial as the rule itself. How, for example, can it be tolerated that a purchase of cattle for market, with an agreement (of frequent occurrence) the seller shall depasture or feed them on his farm, for some weeks or months, shall be condemned as fraudulent against a creditor, who is placed in no worse situation by the nondelivery than he would have been by the immediate delivery of the property; and what good reason can there be for putting such contracts on a different footing from those of ordinary bailments ?
It is, as I humbly conceive, this struggle between the plain and forced meanings of the statute that has filled the American books with cases on the subject too numerous to be even read; and which still harasses the Courts with doubts and difficulties, for which there would seem to be no remedy but to abandon science in despair and return to common sense. I must say, with great deference, that it seems to be carrying a distrust of juries too far to suppose them incapable, with the aid of a wholesome prima facie presumption, to administer justice on this subject in the true spirit of the statute; and that it is better to confine the interposition of the Court to guiding, instead of driving them by instructions, and to the power of granting new trials in cases of plain deviation. And I am apprised of no practical inconvenience that has been felt in those States where the Courts have followed the principle of Lord Mansfield, in Cadogan v. Kennel, Cowp. 432, in which he treats the continued possession of the grantor as only a strong circumstance of fraud, and says such a construction of the statute is not to be made in support of creditors as will make third persons sufferers; and that the statute does not militate against any transaction bona fide, and where there is no imagination of fraud : and so he says is the common law. [This idea of the statute is more fully expressed by the opinions of the Judges in *445 Martindale v. Booth, 3 Barn. & Adolp. 478; 23 Eng. C. L. R. 130.]
The doctrine of Sturtevant v. Ballard, has been followed in some subsequent cases in New York and other States, and its principles sometimes intermingled, rather incoherently, with those of the former doctrine it was designed to supplant; but it has not, so far as I have observed, been established any where, unless in Pennsylvania, where the later, contrary to the earlier decisions, have pushed fraud by intendment of law to great lengths. It has certainly not been established in New York, where the continued possession of the grantor has, in the teeth of that authority, been repeatedly held expressly to be only prima facie evidence of fraud; and where the subject is involved by conflicting opinions in much uncertainty and perplexity, despite an act of the Legislature intended to compose the strife, but which has only occasioned a more animated and determined conflict.
Upon the whole, no one can glance at the confused mass of authorities on this subject of fraud per se, without perceiving that what was intended as a safe and easy guide to the detection and suppression of frauds, has only led to an endless maze of disputation. There is scarcely a proposition in regard to the essence or the application of the doctrine, upon which there may not be found a conflict of authorities. It would be tedious and unprofitable to explore a field of authority so entangled and perplexed; and those w'ho doubt the truth of this will be best convinced by making the experiment.
The doctrine of fraud per se, though plausible in theory, is extremely difficult in practice. It seeks to make a mere question of law of that which in the nature of things is a mixed question of law and fact, and carries within itself the elements of perplexity and contrariety. It cannot be established by broad and peremptory assertions of it in judicial opinions, unless carried *446 out with a reasonable degree of certainty and uniformity in its practical application. We must bear this in mind in considering whether it be the established doctrine in Virginia. And I will now briefly notice most of our adjudged cases that have been cited in the argument as bearing upon the subject.
Clayborn v. Hill, 1 Wash. 177, was the case of a sweeping sale by an embarrassed debtor of his slaves and other personal property to his son, to whom the same had been previously mortgaged for a debt of dubious character, and the bill of sale recorded, after the creditor’s levy of his execution upon the property in the possession of the son, by whom, notwithstanding the alleged sale it had been held, used and enjoyed as his own. It was a suit in equity in which the whole question of Jaw and fact was to be decided by the Court, and the sale was held to be fraudulent. The question whether the mere fact of the grantor’s retaining possession rendered the transaction fraudulent, was neither discussed nor decided ; and there were no proofs in the case to repel the prima facie presumption of fraud, but on the contrary strong circumstances to confirm it.
Fitzhugh, v. Anderson, 2 Hen. & Munf. 289, was not the case of a sale at all, but of a gift or loan. A son, anterior to our statutory provision in relation to loans, had received from his father sundry slaves, and was suffered to remove with them to a distant county, and to hold and enjoy them as his own for many years, exercising over them every act of ownership, pledging some for the loan of money, obtaining credit in fact for goods, &c. on the faith of his being the real owner, selling some, offering others at private sale, and never intimating that his title was incomplete, until they were about to be sold under an execution, when he made some declarations to the contrary for the purpose, as he afterwards acknowledged, of preventing the sale. The bill was filed by the representatives of the father against the pur *447 chasers at the sheriff’s sale, or their representatives ; and it was held, against parol evidence of a loan, that the transaction should be treated as a gift from the father to the son. It is true one of the Judges discussed somewhat the doctrine of fraud per se in reference to sales, but it was only by way of analogy and illustration.
In Alexander v. Deneale, 2 Munf. 341, the Court asserted the broad, and it would seem unlimited, proposition, that an absolute deed of slaves, or other personal property, the possession of which remains with the vendor, is fraudulent per se as to creditors; but asserted it not upon principle, but supposed authority, declaring it, without any discussion of either, to be the settled rule; by which must have been meant the settled rule either in England, or the Federal Courts, or our sister States, nothing having been settled in Virginia on the subject. The case is very briefly and imperfectly reported, and gives no certain information of the true consideration of the deed. That it seems stated the consideration to be 3000 dollars, but we are told that according to the evidence the bill of sale was given to secure the grantees, they being his creditors, to a considerable amount, but what, we are uninformed. The deed appears to have been executed after judgment, and information of it given by the creditor to the debtor, pursuant to his previous request, made, it may be inferred, with the view of defeating the claim. And if we are to understand that the sale was in fact absolute, and the consideration of it a debt due from the grantor to the grantees, then the proposition, taken in reference to that state of facts, did not exclude a distinction, such as has been drawn in South Carolina, between a sale by an embarrassed debtor to a preferred creditor, in satisfaction of his debt, and one to a stranger for a fair price advanced at the time, the vendor’s retaining possession being regarded there as conclusive evidence of fraud in the former, but not in the latter. Or if we are to understand that the *448 bill of sale was intended to operate as a mortgage, then the case presented another question, to wit, whether under our statute requiring all mortgages and deeds of trust to be recorded, a parol mortgage can be established against other creditors, under a conveyance by an absolute deed, though admitted to record.
Hardaway v. Manson, 2 Munf. 230, was the case of a sale by a father to his son of a number of slaves for a fair and full consideration, partly paid in discharge of debts of the father, and the residue amply secured to him: an absolute bill of sale was executed and the slaves delivered, but the delivery as to some of them was merely formal; it being stipulated as to them, at the time of the contract, that they should remain with the vendor till the Christmas following, in order to finish the crop. They did so remain, and continued in his possession afterwards, under contracts for hiring from year to year, until one of them was levied upon and sold, at the suit of a judgment creditor of the vendor: and to recover him detinue was brought. There was no conflict in the evidence, which clearly ascertained the facts, and the cause turned upon the question whether the sale was per se fraudulent in regard to the creditors of the vendor. And this Court held that the Court below erred in instructing the jury that the possession of the slave so retained by the vendor, was not only evidence of fraud, but amounted to a fraud in itself; because the weight of evidence touching such possession was a question belonging exclusively to the jury, and ought to have been left to them without any such declaration or direction, unless the Court had been compelled by a demurrer to evidence to decide upon it. This decision throws but little light upon the subject, except as it tends to shew, that the question of fraud is a mixed question of law and fact, and when presented by the issue before the jury, must be decided by them, and not by the Court.
*449 Robertson v. Ewell, 3 Munf. 1, was the case of a sale by an executor of a slave belonging to his testator’s estate, though the other assets were sufficient for the payment of debts, and made in payment of an individual debt due from the executor to the purchaser, who knew that the slave was the property of the estate, and was bound to know, that by statute an executor is prohibited from selling slaves of his testator’s estate, unless the other personal estate be insufficient for the payment of the debts, and whose duty it was, under the circumstances, to enquire into the state of the assets. The slave was never delivered to the purchaser, but remained for years in the hands of the vendor, and until possession was obtained by the defendant, who was a distributee and coexecutor, and against whom the vendee brought detinue. And it was held, upon a special verdict, that the claim of the plaintiff being under an absolute bill of sale by an executor, who was nevertheless permitted to retain the possession, was to be considered as fraudulent and void as against the distributees, under the true construction of the act to prevent frauds and perjuries, and the principles of the common law. No one can doubt that the conclusion of fraud, from the facts of this case, was legitimate and inevitable, whether drawn by a jury or a Court.
In Thomas v. Soper, 5 Munf. 28, the only point decided was, that fraud against creditors is no ground for impeaching a contract of sale, as between the parties.
Williamson v. Farley, Gilm. 15, was the case of a conveyance by an absolute bill of sale of certain slaves, but only a formal delivery of them, and a hiring of them for a year by the vendee to the vendor for their food and clothing, A few days after the execution of the bill of sale, the vendor conveyed them by a deed of trust, to secure a debt which he owed; and in an action of detinue brought by the trustee in the deed of trust, against the vendee in the bill of sale, it was held, that the Court *450 below ought to have instructed the jury, on the motion of the plaintiff, that if they believed the testimony, the sale was fraudulent and void as to the plaintiff, because the possession remaining with the vendor was a fraud in itself. This decision seems to assert the doctrine of fraud per se. There were, however, - other circumstances, besides the continued possession of the vendor, bearing upon the question of fraud. The consideration stated in the bill of sale, did not appear to have been the price agreed on, nor to have corresponded with the sum actually paid; and notwithstanding the hiring for a year, the vendee took actual possession of the slave within a month from the date of the bill of sale.
In Land v. Jeffries, &c., 5 Rand. 211, 599, a feme about to intermarry with a man who was known to be greatly involved in debt, on the day of and before the marriage, with his consent, executed to her brother then absent in the military service of his country, an absolute and unconditional bill of sale conveying all her personal property, consisting of slaves and furniture, without any consideration of money or other valuable thing passing from the nominal vendee, either expressed in the deed or alleged by the parties. No change of possession followed the deed, either immediately upon its execution, or at any time afterwards; but the property remained in the possession of the feme until her marriage, and afterwards in that of the husband, for several years, and until it was taken in execution by a creditor of the husband ; and was, during this time, used by the husband precisely as if the deed never had been made, he exercising all acts of ownership over it, except that it does not appear he sold any part of it; which possession and use were with the assent of the nominal vendee, after he was apprised of the existence of the deed, which was soon after the marriage. The transaction was held not to be fraudulent per se, nor fraudulent at all, but, as appeared from the parol evidence, for the fair and lawful *451 purpose of securing the property to the separate use of the feme, free from the debts of her husband; and equity, at the suit of the nominal vendee, in the character of trustee, perpetually enjoined the creditor from proceeding to subject the property to his demand.
Glasscock v. Batton, 6 Rand. 78, did not (so far as can be ascertained from a very imperfect report of the case,) present the naked question of fraud perse; but depended upon various circumstances of fraud and adjustment. It was moreover the case, not of a fraud against creditors, but of a fraud against a subsequent purchaser, which is in some respects diverso intuitu; for the latter lays out his money in the acquisition of the specific property, and when he does so without notice, may be deceived, not only by the bad faith, but the gross negligence of the first purchaser, in regard to the assertion of his demand.
In Claytor v. Anthony, 6 Rand. 285, the doctrine of fraud per se was discussed by some of the Judges, but the cause did not turn upon it, and was adjudicated upon a different ground.
In Sydnor v. Gee, 4 Leigh 535, an absolute bill of sale of slaves was executed for a valuable and full consideration, and the slaves formally delivered at the time by the vendor to the vendee; but the possession was not then actually changed, the parties cotemporaneously with the bill of sale entering into a written agreement, by which the vendee hired the slaves to the vendor for their victuals and clothes, taxes and levies, until the end of the ensuing year; which sale and hiring were with no intent to defraud creditors, but bona fde. At the end of the year, the vendee took possession of the slaves and held them for several years. A creditor of the vendor whose debt accrued prior to the sale, brought suit and recovered judgment against him, and levied his execution upon the slaves in the hands of the vendee’s executor. It was held, in an action between the executor *452 of the vendee and the creditor, that the slaves were the property of the vendee’s estate, and not- subject to the execution. It seems that some of the Judges considered the possession of the vendee prior to the levy of the execution, a sufficient ground for that decision; but that it was not the sole ground with all of them, appears from the opinions delivered, some of which question and shake the authority of Williamson v. Farley.
■ In Lewis v. Adams, 6 Leigh 320, there was a bill of sale for two slaves, for their fair market value, in good faith paid by the vendee to the vendor. The slaves were delivered on the same day to the vendee at his house, by the vendor, who brought them from his own residence for the purpose: one of them was on the same day taken home by the vendor, and the other was sent back to him the next day: and the vendee on the day of the sale executed his bond to the vendor for 50 dollars, payable in twelve months thereafter, for the hire of the slaves, which the vendor engaged in the same instrument to furnish with the necessary clothing; which bond was intended as a substitute for the continuation of the vendee’s possession of the slaves, and as evidence of his title to them. Within twelve months from the date of the sale, the vendee executed and delivered to the vendor a deed of trust, whereby, in consideration of natural love and affection for his daughter, the wife of the vendor, and her children, he conveyed the slaves to a trustee, in trust for the wife and her children, their heirs, executors, administrators and assigns; which deed was duly recorded on the day of its date. The slaves continued for some years in the possession of the vendor, who was embarrassed in his circumstances at the time of the sale, and while in his possession was levied upon by an execution creditor, whose debt accrued prior to the sale. The facts were found by a special verdict, in an action upon an indemnifying bond, at the relation of the trustee, and judgment was rendered upon the verdict for the de *453 fendants, but reversed by this Court, it seems, upon the ground that the vendee’s exercise of ownership by the execution of the deed of trust, was equivalent to an actual resumption of possession by him at the date of that deed.
Kroesen v. Seevers, 5 Leigh 434, was the case of an absolute bill of sale, for a valuable consideration, of a slave hired at the time to a third person, with a separate defeasance which rendered the sale conditional. The slave was permitted after the expiration of the bailment, and nonperformace of the condition, to remain in the possession of the bailee. And the bill of sale was held to be good against the creditors of the vendor.
Thus, I think, it will be seen that there is no such certainty and uniformity in our own adjudged cases on this subject, as to preclude us from examining it upon principle, and giving to our statute a fair and just construction, according to its plain meaning and true policy: that although the doctrine of fraud per se has sometimes been asserted in broad terms, it has been upon the misapprehension that the law had been so “ settled” by adjudications elsewhere : that we have never sanctioned the rule of Slturtevant v. Ballard, and practically have repeatedly departed from, or at least modified, the supposed rule of Edwards v. Harben: that it seems now conceded on all hands the continued possession of the vendor after an absolute sale, is open to explanation in some form or shape: and that we are not so restrained by authority as to prevent our allowing an explanation that shews such possession, and the whole transaction to have been fair and honest, and especially where such possession has been held under a bailment, for a valuable consideration, in good faith made from the vendee to the vendor.
In my notice of our adjudged cases, I have not presumed to contrast or discuss the separate opinions in some of them, delivered by learned and able Judges. *454 These are doubtless entitled to profound respect and deference: but of what profit would be such a course in regard to this subject, upon which the highest judicial names in the highest tribunals are to be found in direct an(j irreconcilable conflict ?
I lay no stress in this case upon the proof at the trial of an actual delivery of the slaves to the vendee at the time of the contract; for the hiring of them by the vendee to the vendor at the same time shews the delivery to have been only formal. The substance of the whole transaction was a fair sale on the one hand, and a fair bailment on the other: the two taken together I consider as equipollent with a transmission of the possession, and any thing more as matter of form, such as might attend indifferently a bona fide or a fraudulent sale.
I think there was no error in the instruction given by the Hustings Court to the jury, nor in the refusal of that Court to grant a new trial; and consequently that the judgment of reversal by the Circuit Court is erroneous.
Brooke, J. As to the doctrine of fraud per se, I still adhere to what I said in Land v. Jeffries, 5 Rand. 211. In that case I cited the opinion of Lord Mansfield in Cadogan v. Kennett, Cowp. R. 432, on this doctrine. He said, “ If there is a sale of goods, and the vendor remains in possession and appears as the owner, it is evidence of fraud, because goods pass by delivery only. Such a possession and ownership unexplained by evidence of circumstances accounting for it, make the deed fraudulent per se, upon the general principle that prima facie evidence uncontradicted becomes conclusive of the fact which it is intended to prove. The case of Edwards v. Harben, and the cases in this Court go no further.
It would be a waste of time to produce cases to shew that such explanation may be given when it is confined to unavoidable circumstances exclusive of any agreement or assent of the parties inconsistent with the deed.
*455 In the case before us the facts are, that Davis purchased the slaves at the factory of Wyche; that Wyche proposed to hire them until Davis would take them away, to which Davis would not assent; that the slaves were then delivered to him by Wyche, and when going to Davis’ office to pay the price of them, Wyche again proposed to hire them until Davis would take them away. The delivery was a change of property, and Wyche, if he had not been paid, had an action against Davis for the price of the slaves. In the cases of Sydnor v. Gee, 4 Leigh 535, and Lewis v. Adams, 6 Leigh 320, what I said on the doctrine of fraud per se was because Edwards v. Ilarben had been improperly insisted on in the argument, and some of my brother Judges also relied on their construction of it as applying to the case. They seem to have overlooked one expression of the Judge in that case, who after stating the case, said: <:If there is nothing else,” meaning, if there is no explanation accounting for the vendor’s retaining the possession after the sale. I refer to my opinion in Land v. Jeffries, by which this will be better understood.
Cabell, P. The facts of this case have been so fully and so clearly stated by my brother Baldwin, that no farther repetition of them is necessary or desirable. They involve and require an investigation as to'the effect of the retention of possession of goods and chattels, by the vendor, after an absolute sale thereof.
It may not be improper to state, that I was the Judge to whom the petition for a supersedeas in this case was originally presented, and that after a careful examination of the record, I was decidedly of opinion, that, according to repeated decisions of this Court, the judgment of the Superior Court was correct and ought to be affirmed. Yet, as I was well aware that the opinions of two of the Judges of this Court, (Carr and Tucker,) in the cases of Sydnor v. Gee, 4 Leigh 535, and Lewis v. *456 Adams, 6 Leigh 320, had shaken the confidence of the profession in the former decisions of this Court, and had produced doubts and uncertainty as to the future, I deemed it my duty to award the supersedeas, in order that the whole subject might be gravely reviewed by a full Court, and the law on this interesting and important subject might be finally settled, so as to preclude future controversy. Accordingly, we have had the aid of an argument, by the bar, manifesting great research and signal ability on both sides; and I have given to the subject the deepest consideration of which I am capable, with no other desire than to come to the proper conclusion, whether that conclusion should accord with or differ from my former declared opinions. I proceed, now, to state my present views and convictions.
It is unquestionably true, that the mere retention of possession by the vendor, does not, of itself, render the deed fraudulent and void. For, as Lord Eldon said, in Lady Arundel v. Phipps, 10 Ves. 140, “the mere circumstance of possession of chattels, however familiar it may be to say that it proves fraud, amounts to no more than that it is prima facie evidence of property in the man possessing, until a title, not fraudulent, is shewn, under which that possession has followed. Every case from Twyne's Case (3 Coke’s Reports 80) downwards proves that.” Indeed, I have always understood it to be universally admitted, that the possession of the vendor, may, in some way, be explained so as to remove and destroy the force and effect of the prima facie evidence of fraud afforded by the retention of possession.
Yet we often see it announced, in general and unqualified terms, even from the Bench, that an absolute deed of personal property, the possession of which remains with the vendor, is fraudulent per se.
Thus in Alexander v. Deneale, 2 Munf. 341, decided in September 1811, where a debtor executed to two of his creditors a deed, which was duly recorded, con *457 veying to them all his property, in consideration of the sum of 3000 dollars, according to the instrument itself, but according to other evidence, in order to secure to them the payment of a considerable debt which he owed them; part of the property was delivered at the time, but was immediately restored to the vendor, and remained in his possession. An action being brought in the Haymarket District Court, against Deneale, a sheriff who had seized and sold, some of the property, under an execution against the vendor, the defendant moved the Court to instruct the jury, that the deed was fraudulent. The Court stated, that “ as the law now stands, an absolute conveyance of personal estate, where the party making it retains possession, is void as to creditors, even without other evidence of fraud; though this appears to be carrying the matter too far, and perhaps, agreeably to ancient determinations, it would have been better to have considered it as evidence of fraud, connected with other circumstances.” On an appeal from this decision, Judge Roane pronounced the opinion of this Court, in the following terms: “ The Court being of opinion, that the instruction of the District Court conforms, in substance, to the settled rule, that an absolute deed of slaves, the possession of which remains with the vendor, is fraudulent per se as to creditors, approves of that instruction and affirms the judgment.”
Again, in Robertson v. Ewell, 3 Munf. 1, decided in March 1812, where there was an absolute bill of sale of slaves by an executor, this Court declared that “ the title of the appellee (the vendee) to the slaves in question, being under an executor, who was nevertheless permitted to retain the possession thereof, the same ought to be considered as fraudulent and void.” It is true, that in this case much stress was laid, in the argument, upon the fact that the executor had sold the slave in payment of his own debt. But it will be perceived that the Court did not allude to that fact, but decided *458 the case simply on the ground of the possession remarn- . ... mg with the vendor.
So, also, in Thomas v. Soper, 5 Munf. 28, decided in February 1816. The Court below had instructed the jury t]jat « although in the case of an absolute deed for negroes, where the vendor remains in possession after the execution and recording the same, such deed, as to creditors and subsequent purchasers, is to he regarded as fraudulent and void; yet, as between the vendor and vendee, and their immediate representatives, it was obligatory, and could not be impeached by the testimony offered- by the defendant as administrator of the grantor, which defendant was not himself a creditor.” To this opinion of the Court, a bill of exceptions was filed; and a verdict being found and judgment rendered for the plaintiff, the defendant appealed to this Court, where the judgment was affirmed.
So, again, in Williamson v. Farley, Gilmer 15, decided in April 1820, which was an action of detinue for slaves, and, in many of its circumstances, strongly resembles the case now under consideration. In that case both the plaintiff and the defendant claimed certain slaves under conveyances from Jacobus Christopher; the former by deed of trust dated 13th January 1817, conveying the slaves to him, in trust to secure a debt due to one Tavener; the latter by absolute bill of sale to him by Christopher, dated January 6, 1817, the consideration of which was the sum of 1000 dollars. The subscribing witnesses to this last deed, proved that the slaves were delivered to Farley at the time of executing the deed. They also proved, that at the same time and place, Farley hired the said slaves to Christopher for one year for their food and clothing, and took a bond for their restoration at the end of the year; that the slaves remained in the possession of Christopher from the date of the bill of sale, till about the first of February following, when Farley took possession of them. They *459 farther proved that Farley had paid Christopher for the said slaves between 775 and 780 dollars, and that he was the acting partner of a mercantile firm to which Christopher was indebted in the sum of 400 dollars. These facts being set forth in a bill of exceptions, the plaintiff moved the Court to instruct the jury, that, if they believed the testimony, the sale was fraudulent and void as to the plaintiff, because the possession remaining with the vendor, was a fraud in itself The Court refusing the instruction, Williamson appealed. Judge Roane pronounced the opinion of the Court as follows : “ The Court is of opinion that the judgment of the Superior Court is erroneous in this, that the instruction asked for by the appellant, was not given. Therefore it is reversed with costs, and a new trial is awarded in which the instruction aforesaid, if required, is to be given.” Thus, again, reiterating the doctrine that the possession remaining with the vendor, is fraud per se.
It will be observed that in the first of these cases, the reporter does not give the argument of the bar, and that the Court refers to no authority, and enters into no reasoning, farther than to announce the principle of the decision. The same remark as to the Court, applies to the three other cases. In Robertson v. Ewell, the counsel referred to Alexander v. Deneale, and in Williamson v. Farley, the reporter, in a note, refers to the three preceding cases. But in all of them the Court regarded it as a settled rule, that the possession of the vendor, after an absolute bill of sale, is fraud per se.
How then are we to understand these decisions ? Certainly, not literally; for it would shock common sense and reason to affirm, that the possession of the vendor, is, in all imaginable cases, fraud per se. For, as I have already observed, it is conceded by all, that the mere possession of the vendor is only prima facie evidence of fraud, and that the possession may be explained, so as to remove that presumption.
*460 Whilst then it is certain that according to these decisions, there is one class of cases in which the possession of the vendor is fraud per se, it is equally certain that there is another class in which his possession is fair and honest. What is the line which separates these two classes ? What is the principle which will, by its application, enable us to assign to each class its proper position ? Although the Court did not cite any authority in any of the cases that I have above referred to, yet as I sat in.all of them, even in the one decided in 1811, I well know that they were all decided on the authority of the case of Edwards v. Harben, 2 T. R. 587; on which same authority the Supreme Court of the United States had previously decided the case of Hamilton v. Russel, 1 Cranch 309. But it is not necessary to refer to the recollection of any individual Judge for evidence on this subject; for the judgments of the Court afford internal evidence of the foundation on which they rest. The terms used by the Court are the very language of Judge Butter, in Edwards v. Harben; terms not to be found in connection with this subject, in any previous case, except that of Haselington v. Gill, 3 T. R. 620, in a note, decided four years before Edwards v. Harben, in which the same Judge, (speaking for himself and not for the Court,) uses similar language. It is to that case, then, that we must refer for the principle which, according to the former decisions of this Court, is to determine when the possession of the vendor is fraudulent per se, and when it is fair and unexceptionáble. It would be an improper waste of time in me to go into any reasoning on this occasion to shew what that principle is, having already in the case of Land v. Jeffries, 5 Rand. 599, said all that I could say on that subject; to which I beg leave now to refer. I will only add that, in my opinion, the principle of the decision is the consistency or inconsistency of the possession of the vendor, with the tenor and effect of his absolute deed. The very terms of this *461 proposition imply that the possession may be explained for the purpose of shewing its consistency or inconsistency with the deed. If it shall appear from the circumstances of the transaction, that the possession is consistent with the deed, no inference can be drawn from the mere fact of possession against the validity of the conveyance ; and it will be held to be fair, unless it be shewn by other testimony to have been executed with intent or purpose to delay, hinder or defraud creditors or subsequent purchasers. If on the other hand no attempt at explanation shall be made, or if an attempt be made and it should fail to prove the consistency of the possession of the grantor, with the object and tenor of the deed, then the prima facie evidence of fraud arising from the possession, becomes conclusive, and the possession will be held to be fraudulent per se, (of itself.) without any other evidence of fraud, and even against the most positive proof of the actual fairness of the transaction. And I will add, that if I now thought, as I formerly thought (relying as I did upon the authority of Edwards v. Harben,) that the rule laid down in that case was law, I should still believe that the principle of consistency or inconsistency of possession, is the only principle which could serve as a clear and certain test for the proper application of the rule. For what but such a principle as this could have invalidated the conveyances in Williamson v. Farley, Hamilton v. Russel, and even in Edwards v. Harben. I will not recapitulate the circumstances of these cases ; but it is clear to my mind beyond the possibility of doubt, that the transaction in each of them was perfectly fair and honest, and without any imagination of fraud.
Such is the rule, as to fraud per se, as laid down in Edwards v. Harben; and to which I have heretofore given my ready assent, in the firm belief that that case had established it as a clear and undoubted principle of the common law of England, adopted by us, on our se *462 paration from that country. I had good reason to regard case as of the highest authority; for it was the unanimous judgment of the Court of King’s Bench, after consultation with all the Judges of England; and it was mage the basis of the decision of the Supreme Court of the United States, in the case of Hamilton v. Russel.
But the question is now gravely submitted for our consideration, whether the rule laid down in Edwards v. Harben, is, in truth, a rule of the common law.
The new lights thrown upon this subject, in my recent investigations, compel me to answer this question in the negative. I am constrained to regard it as an interpolation upon the common law, by the Court of King’s Bench, effected by the influence of that eminent Judge, Mr. Justice Buller; and it is so regarded now, even by the Courts of Westminster Hall, as I will proceed to shew.
The advocates of the rule, refer to the opinion of Lord Coke in Stone v. Grubham, 2 Bulstrode 217, and think that they discover, in that case, the foundation of the rule. It might be a sufficient answer to this suggestion, to say, that that was not the case of an absolute deed. But let us examine the case. It will be observed that none of the circumstances of the case are given, except that it was an action of ejectment; that the deed was, on its face, a conditional deed; and that the retention of possession was in accordance with the deed. Yet it was still contended that that possession was fraudulent, and invalidated the deed. As to this, Lord Coke said, “If a man do mortgage his land, and yet continues his possession, no disseizin is wrought by this ; and so was Winnington’s Case. If it was an absolute conveyance, and a continuance in possession afterwards, this shall be adjudged in law to be fraudulent; for this hath the face of fraud; but otherwise it is, as it is here in this case, where the conveyance was only condition *463 ally, as upon payment of money; there the interest doth not pass absolutely, but upon a future condition; for the gift was before, upon condition of the payment of such a sum by the said Sir Richard Saltingstone. As to the fraud, dolosus versatur in universalibus; but when the conveyance is conditional, continuance in possession after this, shall not, in the judgment of the law, be said to be fraudulent, and this is very clear. And as to the value of the lease, this is not at all material.” To this dictum of Lord Coke, (for it was certainly nothing more,) I beg leave to oppose the remark of Lord Eldon, before quoted : “ The mere circumstance of possession of chattels, however familiar it may be to say that it proves fraud, amounts to no more than that it is prima facie evidence of property in the man possessing, until a title not fraudulent is shewn,” &c. The obiter remark of Lord Coke, may not have been intended to mean more than what was declared by Lord Eldon. It does not shew, to my mind, that he meant to say, that the possession of a vendor, inconsistent with the deed, was fraud per se, and precluded the introduction of other proof shewing that the transaction was fair and honest; as was held in Edwards v. Harben. If we wish to know Lord Coke’s well considered opinion upon that point, we may find it in his report of Twyne’s Case, 3 Coke’s Rep. 80. That was the case of an absolute conveyance, for valuable consideration, and the possession of the vendor was clearly inconsistent with the deed; for, as Lord Coke said, “ he continued in possession of the said goods, and some of them he sold, and he shore the sheep, and marked them with his own mark;” and the question was, whether the deed was fraudulent or not. In considering the effect of the continuance of the possession of the vendor, Lord Coke regarded it as a “ sign or mark” of fraud. He enumerated five other different “ signs or marksone of which, was the very trifling fact, that the deed contained a clause, stating that the deed was *464 made “honestly, truly and bona fide.” If Lord Coke had thought that the inconsistency of possession, was in itself conclusive evidence of fraud, it is passing strange, that he should have relied on it merely as a sign or mark of fraud, in the same category with the declaration in the deed, that it was made honestly, truly and bona fide!
It would seem that even Judge Buller, not long before the case of Edwards v. Harben, which was decided in the year 1788, regarded inconsistency of possession as only a mark of fraud; for in his valuable work on trials at Nisi Prius, page 257 b. (Bridgman’s edition,) he states, fully and clearly, the facts of Twyne’s Case, and the marks of fraud, on which the Court held it to be fraudulent; but he said nothing about the inconsistency of the possession ; and then he adds, “ But yet the donor continuing in possession, is not in all cases a mark of fraud ; as where a donee lends his donor money to buy goods, and at the same time takes a bill of sale of them for securing the money.” Here, then, we see, that in Twyne’s Case, which was clearly a case of inconsistent possession, he treats the possession as only a mark of fraud; and in the case which he himself supposed, and which, also, was manifestly a case of inconsistent possession, he regarded the possession as not even “a mark of fraud.”
I will refer to one other case, decided before Edwards v. Harben, namely, the case of Martin v. Podger, 2 W. Bl. R. 701. This was an action against the sheriff for taking the plaintiff’s goods; plea, not guilty, and verdict for the plaintiff, with £ 28 damages. On a motion by the defendant for a new trial, it appeared that the- goods in question had been the property of William Martin, the plaintiff’s son, who on the 20th June 1768, made a bill of sale of them to the father, and was after-wards (19th July 1768) arrested and carried to jail, at the suit of one Bryant, for a debt of £ 31. 10. The *465 defendant produced in evidence at the trial, a Ji. fa. tested the 27th July 1768, against the said William Martin, the son, at the suit of Hugh Pullen, for £ 320, and proved that in execution of this writ, they seized the goods in question, which were then remaining in the said William Martin's house. It will thus be seen, that here was an absolute deed, and a continuance in possession, by the vendor, inconsistent with the deed. The Court (Lord Mansfield, Chief Justice,) was unanimous in granting a new trial; not because such possession was fraudulent per se, but because, in the language of the Court, “the circumstances of the bill of sale, being extremely suspicious, the Judge ought to have left it to the jury, on the ground of fraud."
I will now examine some of the cases decided in Westminster Hall, since Edwards v. Harben.
And first, the case of Kidd v. Rawlinson, 2 Bos. &. Pull. 59, decided in the year 1800. The abstract of the reporter renders a detailed statement unnecessary. “ The goods of A being taken in execution, and put up to sale, B became the purchaser, and took a bill of sale of the sheriff, but permitted A to continue in possession. A then executed another bill of sale of the same goods to C, a creditor, under which the latter took possession ; whereupon B (the purchaser from the sheriff) brought an action against C for the goods. Held, that the first bill of sale was valid, and that B was therefore entitled to recover.” In deciding this case, Lord Eldon cited, with approbation, the passage from Buffer’s Nisi Prius, which I have quoted above.
Benton v. Thornhill, 2 Marshall 427; 2 Eng. C. L. R. 52, decided in the Common Pleas, in the year 1816. “A, a farmer, executes a biff of sale, on the 26th September, of all his property, absolutely, to B, for a debt of £ 600. B puts his son in possession, A continuing to reside on the premises and to conduct the farm. On the 30th of November, the sheriff takes the stock, *466 corn, &c. in execution, at the suit of C against A. After satisfying the execution, enough remained to cover the £ 600 due to B. Held, that the jury, allowing for the fluctuation of the market, were warranted in findjng that the goods, at the time of executing the bill of sale, were not worth more than the £ 600; and that, therefore, the bill of sale was made bona fide, and that A was entitled to recover to the amount of the £ 600, in an action against the sheriff.” In the argument of this case, one of the counsel having stated that “ want of possession was not only evidence of fraud, but constituted it,” Chief Justice Gibbs dissented, and referred to the passage in Buller’s Ni. Pri. quoted above. Justice Dallas, in delivering his opinion, said, that “ as to fraud, that is always a question for the jury.” And Mr. Justice Parks and Mr. Justice Burrough declared themselves to be of the same opinion.
Jezeph v. Ingram, 1 B. Moore 189, and 8 Taunton 838, 4 Eng. C. L. R. 303, decided in the Common Pleas in 1817. The circumstances of this case, as stated in the reporters, are too numerous to be detailed here. I regard it as a case of inconsistent possession. The property in question had been taken in execution by the sheriff. A friend of the debtor in the execution, lent him money to redeem the property from the sheriff, and it was redeemed accordingly; whereupon the lender of the money, took from the debtor an assignment of the goods to secure the repayment of the money; the property remaining in the possession of the vendor, both he and the vendee exercising occasional acts of ownership over it. The title of the vendee was ultimately supported; as will appear in the report of the case by Taunton, p. 844. I cite this case, principally for the sake of the opinions of the Judges, as to the authority of the case of Edwards v. Harben. Chief J. Gibbs and Park, Justice, cited with approbation, the passage in Buller’s Ni. Prius, above referred to. Copley, coun *467 sel, having cited the case of Edwards v. Harben, Justice Dallas, in delivering his opinion, said, “I dissent from my brother Copley, that the case of Edwards v. Harben lays down a general rule, that in transferring chattels, the possession must accompany and follow the deed.”
Latimer v. Batson, in the King’s Bench 1825, 10 Eng. C. L. R. 432. I give the abstract of the reporter. “ The goods of A were seized under a fi. fa. and the judgment creditor took a bill of sale from the sheriff, and afterwards sold the goods to B, who put a man in possession; but the goods remained in A’s house, and were used by him as before the execution. The circumstance of the execution was, however, notorious in the neighbourhood. Another judgment creditor issued a fi. fa. against A, under which the sheriff seized these goods. In trespass against him by B, held, that the jury were properly directed to give a verdict for the plaintiff, or the defendant, as they should be of opinion that the purchase by B was bona fide or otherwise; for that, if the goods were bona fide bought and paid for with his money, the sale was not rendered void by the debtor’s continuing to enjoy the use of the property.” Abbot, C. J. said, “ I am of opinion, that this case was left in a proper manner to the consideration of the jury.” — “ I perfectly agree that possession is much to be regarded : but that is with a view to the good faith of the transaction.” Bayley, J. said, “ In Leonard v. Baker, 1 M. &. Sel. 251; Watkins v. Birch, 4 Taunt. 823, and Jezeph v. Ingram, 8 Taunt. 838, it was held that if goods seized under execution are bona fide sold,” (In Jezeph v. Ingram, the goods were not sold by the sheriff, but by the former owner, who had redeemed them from the sheriff,) “and the buyer suffers the debtor (his vendor) to continue in possession of the goods, still they are protected against subsequent executions, if the circumstances under which he had the *468 possession are known in the neighbourhood. The jury were therefore properly directed to give their verdict for the plaintiff, or defendant, according as they should be of opinion that the transaction was fair or fraudulent.” Holroyd and Littledale, J’s, concurred.
The next case is Martindale v. Booth, in the King’s Bench, 23 Eng. C. L. R. 130. This case is cited for the purpose of shewing the opinions of the Judges of the case of Edwards v. Harben. Littledale, J. said: “ The cases shew that continuance in possession of goods and chattels by a vendor, after the execution of a bill of sale, is a badge of fraud; but I think that under the circumstances of this case, a jury would have negatived the fraud.” Parke, J. said, “I think that the want of delivery of possession does not make a deed of sale of chattels absolutely void. The dictum of Buller, J. in Edwards v. Harben, has not been generally considered in subsequent cases, to have that effect. In Benton v. Thornhill, 2 Marshall 427, it was said in argument, that want of possession was not only evidence of fraud, but constituted it. But Gibbs, Ch. J. dissented; and although the vendor there, after executing a bill of sale, was allowed to remain in possession, Gibbs, Ch. J. at the trial, left it to the jury to say, whether under all the circumstances, the bill of sale was fraudulent or not.” Patteson, J. said, <! There is not sufficient authority for saying that the want of delivery of possession,- absolutely makes void a bill of sale of goods and chattels. It was held in Martin v. Podger, 2 Wm. Blackstone 701, that want of possession was a badge of fraud which ought to be left to the jury. Then if it be a badge of fraud only, in order to ascertain whether a deed be fraudulent or not, all the circumstances must be taken into consideration.”
I will cite only one other case, Linden v. Sharp, 46 Eng. C. L. R. 893, decided in the King’s Bench in 1843, which I cite, like some of the others, not for the sake *469 of the case itself, but of the opinions of the Judges. One of the counsel having referred to the case of Edwards v. Harben, and observed that “ the debtor’s continuing in possession is inconsistent with the deed, and fraudulent against creditors,” Tindal, C. J. interrupted him and said, “ The modern doctrine is, that it must be left to the jury to say, whether the continuance in possession is fraudulent or not. It is a strong fact, but not conclusive.” And Erskine, J. said, " In Martindale v. Booth, (one of the cases already cited,) the doctrine of Buller, J. in Edwards v. Harben, is repudiated ; and continuing in possession, is treated as evidence only, to be left to the jury that the transfer was colourable. Buller, J. treats it as a question of law. But in the later cases, which are collected in a very good note to Twyne's Case, in Smith’s Leading Cases, page I, (I have cited the most of them,) it has been considered that it is a question for the jury.”
I have now completed the examination of all the cases to which I have deemed it necessary to refer; and I think I may confidently affirm, as the result of the whole, that in the estimation of the Judges of Westminster Hall, the rule of fraud per se, as applied by the case of Edwards v. Harben, to the retention of possession by a vendor, has been abandoned, condemned, repudiated ; and that it never formed a part of the common law; but that in all cases the question of fraud or no fraud, as to the possession of the vendor, is a question of fact, to be left to the consideration of the jury, on a view of all the circumstances of the case ; subject, however, to the accustomed power of the Court to instruct the jury, as to the law arising on such/acfe as the jury may believe to be proved; and subject moreover to the salutary power of the Courts to grant a new trial in case the verdict shall be contrary to the evidence. The case of unexplained possession, or as Buller, J. expresses it, “ where there is nothing but the possession,” forms no exception to this general principle. Such a case *470 neither requires nor admits the application of the narrow rule in Edwards v. Harben. It rests on the broad foundation of the general principle of the law of evidence, which declares that prima facie evidence becomes conclusive, when the presumptions arising from the prima facie evidence, are not repelled by other countervailing circumstances.
As the case of Edwards v. Harben, so far as it purported to establish a general rule, that an absolute deed of personal property, the possession of which remains with the vendor, is fraudulent per se, and void as to creditors, has been thus repudiated in England, and declared not to be law ; and as the decisions of our own Court on this subject, were founded solely on the authority of that case, it becomes manifestly proper for us now to determine whether that case ought still to be regarded as authoritative evidence of the law, or whether it should, as in England, be repudiated and abandoned.
After much deliberation, I am entirely satisfied as to the correctness of the modern decisions of the English Courts, of which I have given extracts; and that there is no such rule known to the common law as that which was supposed to be established by the case of Edwards v. Harben.
And, apart from all authority, I am of opinion, that there is no good reason for such a rule. It is true that the rule has one advantage — the advantage of simplicity ; for it affords a ready and easy solution to all the questions coming within its range. But this advantage is obtained at too dear a price. It is often obtained by a sacrifice of the justice of the case. How can it be otherwise, when in deciding a case, the correct decision of which depends on the good or evil intent of the parties, one single circumstance, (inconsistency of possession,) is arbitrarily seized on, and made conclusive evidence of evil intent, to the total exclusion of every circumstance which would prove good intent! In my long experience, I have had occasion to observe the mischie *471 vons operation of the rule; for, under its application, I have found myself compelled, as a Judge, to pronounce transactions to be fraudulent and void as to creditors, which were known to be perfectly fair and bona fide, and were not intended or calculated to delay, hinder or defraud creditors),
Nor do I apprehend any danger to the rights of creditors, from the relaxation or abandonment of the rule of fraud per se. Their rights will be abundantly secured by the universally admitted rule, that the mere fact of retention of possession by the vendor, is regarded as prima fade evidence of fraud as against creditors of the vendor, and will vacate the transaction as to them, unless the vendee shall prove it to have been fair and bona fide. Can justice require us to go farther?
Some of the opinions now expressed, are widely different from those which I have heretofore entertained. The revolution has not been effected without a struggle. Not that I have, for a moment, permitted the pride of self-consistency to stand in the path to duty; but because from the very constitution of our nature, wo feel a prejudice in favour of opinions long formed and often acted on, which, for a time at least, closes our eyes against the light that would shew that we have erred. But I am convinced, and I cheerfully retrace my steps, by heartily concurring in the judgment about to be pronounced, and which will restore the law to the solid foundation of good sense and sound reason, on which it originally stood.
It is the unanimous opinion of the Court, to reverse the judgment of the Circuit Superior Court, and to affirm that of the Corporation Court of the1 town of Petersburg.
Allen, J. concurred with Baldwin, J.
Judgment of the Circuit Court reversed, and that of the Hustings Court affirmed.